FURMAN *vs.* MEEKER and wife.

Bill to foreclose a purchase money mortgage. Cross-bill setting up fraud in the sale. *Held,* that the evidence failed to disclose any fraud, misrepresentation, or breach of faith.

On bill and cross-bill, answers, replications, and proofs.

*Mr. G. H. Ludlow,* for Furman.

*Mr. Lupton,* for Meeker and wife.

THE CHANCELLOR.

The original bill was filed to foreclose a mortgage given by Meeker and wife to Furman, for $4500, and interest, on certain clay land in Woodbridge township, in Middlesex county, to secure part of the purchase money of the mortgaged premises, on the sale thereof by Furman to Meeker. Meeker and wife answered the bill, and the former filed a

cross-bill, setting up fraud on the part of Furman in the sale. Furman answered, denying the fraud.

The fraud is alleged to have consisted in the representation that the clay (some of which had been dug, and was on the ground at the time of the sale), was of great value for the manufacture of stoneware and retorts; that the premises, throughout its whole extent, ten acres and twenty-one hundredths, contained such clay; that the premises were, by reason thereof, worth $10,000; that the business of mining or digging the clay was a very lucrative one, yielding large profits, and that Furman had great practical experience in the business, and an established reputation for the general quality and excellence of the clay on the premises, and an extensive custom and trade and market for it, and that he was desirous of quitting the business, and of selling the premises, with the produce, trade, and custom. The cross-bill further states that Meeker, being ignorant of the business, induced by these representations, purchased the property, with the good-will, trade, and custom of Furman in the business, for $7500, of which he paid $3000 in cash, and gave the mortgage which is in suit, for the rest. It charges the falsity of the representations, and that Furman did not quit the business, but, on the contrary, directly and openly interfered with Meeker, endeavoring to divert the trade from the latter to himself.

There is no written evidence of the agreement between these parties, except what is contained in a receipt given on the day the bargain was made, when $500 were paid on account of the purchase money. The receipt speaks only of the land. It is dated August 12th, 1868, and acknowledged the receipt of $500, " on account of the consideration of $7500 purchase money, for ten acres, more or less, of clay land, situate in the township of Woodbridge." It furnishes no evidence of the sale of the good-will, custom, and trade, nor of any of the representations set up in the cross-bill.

The other testimony in the cause wholly fails to sustain the cross-bill. The only persons who were present at the

negotiation, were Furman, Meeker, Meeker's daughter, and Charles Gilman. Part of it took place at Meeker's house, and part on the premises which were the subject of it. The young lady was present only at so much of it as took place at the house. Gilman was present at the whole of it.

Meeker, in his testimony, disposes of the statement of the cross-bill in regard to the alleged representation as to the pecuniary value of the property. He says, that Furman did not say the premises were worth $10,000, and that nothing was said on that score.

Both Meeker and his daughter narrow the alleged contract as to good-will, trade, and custom, to the custom of the bank. Furman denies that the good-will and trade of his clay business, or of that particular bank generally, were sold with it, but says that when he sold the bank to Meeker, he gave him the names of all the persons, some of whom he mentioned, to whom he had sold the clay of that bank, and that Meeker took them down on a memorandum; but that nothing was said about the good-will or trade of the bank, except of those customers.

Mr. Gilman was in no wise connected with the parties or either of them, and his testimony in connection with the receipt seems to me to be conclusive as to the particulars of the contract, and the representations made in the negotiation. He was produced by and sworn for Meeker. He said Meeker asked several questions: How many acres there were, and the quality of the clay? that Furman said he sold it as a stoneware bank. The witness thinks he said there were ten acres, more or less, not all clay land—some dug over; that there was a good deal said; that Meeker said, "if I buy your bank, I want to know whom to sell to, for I am inexperienced," and asked if the trade or good-will went with it. The witness thinks that, in reply, Furman spoke of three different firms to whom he sold, one in Philadelphia, and one in New York, and he thinks Furman said that they went with the bank; that Meeker said he would take the

bank on those terms, and went in and drew up the receipt, and paid the $500.

It will be perceived that the testimony of Gilman substantially corroborates that of Furman, and, in my judgment, it disposes of the allegations of fraud in the cross-bill.

Neither Miss Meeker nor Gilman corroborates Meeker as to the alleged representations of Furman, that he was about to abandon the business. On the other hand, it appears, by the testimony of Gilman, that Furman said, both at the house and at the bank, that he had clay and other business enough at South Amboy to attend to, and that was the reason he wanted to sell the property in question. The witness says, he understood Furman to say he was going out of the business in Woodbridge; that Furman said, if he sold his stoneware bank, he had no other of that kind in Woodbridge; that he lived so far off, he could not attend to it, and that that was why he sold it, as he understood it. The witness adds, he does not recollect Furman saying anything about going into the lumber business. Furman, on this point, says, that he did not tell Meeker that he sold out on that side of the river to go into the lumber business on the other side; that he told him that he had clay banks, and as much as he could attend to, on the other side of the river, and did not want to bother with this.

Nor do I find the allegation of the cross-bill, that Furman, after the sale, interfered with the business which, as Meeker insists, he sold to him with the property, in anywise supported by the evidence. The attempt made to prove such interference in the case of the Boston firm of Powers & Edmunds, is entirely unsuccessful. It is hardly necessary to remark, that the letters adduced as testimony on this point, are wholly inadmissible as evidence.

I deem it unnecessary to consider further, or more particularly, the evidence adduced in support of all the various allegations of the cross-bill. None of those allegations are sustained. There is no evidence of fraud or duplicity on the part of Furman, or even of any failure on his part to recog-

nize and discharge the obligations to Meeker, arising out of the sale.

It appears, affirmatively, in the testimony, that the purchase proved to be a very profitable one for Meeker, and that the land was more valuable than he supposed, or was given to understand, when he purchased it ; that in addition to the stoneware clay found in it, it proved to contain a valuable bank of fire-clay. Indeed, one of his witnesses, himself a manufacturer of fire-clay brick and a miner of clay, testifies, upon his cross-examination, that at the time when the injunction to stay waste was served in this cause, by virtue of which Meeker was stopped, the latter had a full force of men at work, and was getting out " a very fine clay, that was in great demand, and as good as coin ;" and the witness thinks that if he had had Meeker's facilities, his bank, and his business, at that time, he could have made $5000 over all expenses, in three months.

It is worthy of remark, that it does not appear that Mr. Meeker made any complaint whatever, of any of the matters set up in the cross-bill, until after the original suit was brought for foreclosure and sale of the mortgaged premises. He purchased the property in August, 1868. On the 25th of March, 1869, in reply to a letter Furman had written him on the subject of paying the bond and mortgage, and for the tools which he had purchased from Furman at the bank, he enclosed a check for the interest, and what he supposed, from memory, was the amount of the bill of tools. On the 19th of August following, he writes to Furman, who, ten days before that, had written to him, urging payment of the bond and mortgage, that he was about to sell the bank, and that as soon as he received the proceeds, he would pay the mortgage, and promised to send the interest when it should become due. On the 15th of September, 1870, in reply to a letter of Furman's to him of the 8th of the same month, in which Furman threatened foreclosure unless the amount of the mortgage was paid on the 1st of March, he promised payment by the 1st or the middle of April, and offered to

make payment at once, if Furman would take, on account, a good mortgage of $3000, which Meeker owned, and which came due on the 15th of April. In none of these letters does he make, or even intimate any complaint of fraud or misrepresentation, or charge any breach of faith, on any account, against Furman, or make any claim to deduction.

The cross-bill is dismissed, with costs. Furman is entitled to a decree for the whole amount due upon his bond and mortgage.